UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| NANNIE BLACKBURN, *et al.*, | Case No. 3:20-cv-046-GFVT |
| *Petitioners,* | Judge Van Tatenhove |
| v. | |
| MARY NOBLE, *et al.*, | |
| *Respondents.* | |

**REPLY IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

Petitioners, seven women incarcerated at the Kentucky Correctional Institution for Women ("KCIW"), face an ongoing violation of their rights under the Eighth Amendment to the United States Constitution. As described in detail in their Petition for Writ of Habeas Corpus (Doc. No. 1, "Pet."), each petitioner has severe medical vulnerabilities that expose them to exceptionally grave risk from COVID-19. Respondents are aware of this grave risk posed by COVID-19 and the crucial importance of adequate social distancing to these particular Petitioners, yet Respondents have continued to incarcerate Petitioners in a congregate environment where social distancing is impossible even as a COVID-19 outbreak erupted at KCIW without addressing their particular circumstances. Indeed, this Court issued an order giving Respondents ten days to respond to the Petition, specifically seeking information regarding "whether KCIW 'reasonably responded' to the risk posed to inmates from COVID-19" and "the impact on the public from release of inmates." Doc. No. 8, Order (June 17, 2020). Respondents filed their Response Opposing Petition for Writ of Habeas Corpus ("Resp.") on June 29, 2020, but provided almost no new information regarding the Petitioners or their claims. In light of this largely uncontested evidence that Respondents have

1

not responded reasonably to the grave risk posed to Petitioners by the COVID-19 outbreak at KCIW, Petitioners urge the Court to grant their petition for writ of habeas corpus or order an evidentiary hearing to resolve any outstanding questions of fact.

## I.     SUMMARY OF FACTS

**A.     It Is Undisputed That Petitioners are Exceptionally Vulnerable to COVID-19**

The Petitioners in this case are seven women who suffer from serious underlying medical conditions that make them particularly susceptible to serious illness or death if they develop COVID-19. None of these critical facts were disputed by Respondents. A summary of these undisputed facts, though, is critical to understand the legal basis underlying this Petition. Petitioner Nannie Blackburn is a cervical cancer survivor with high blood pressure, an underactive thyroid, and Hepatitis C. Pet. at ¶ 18. As a result of these conditions, she frequently feels tired, worn down, and short of breath. *Id.* Petitioner April Hoover lives with severe heart disease, as well as high blood pressure and high cholesterol. *Id.* at ¶ 19. At least one doctor has reported to her surprise that she has not had a major heart surgery, and she receives more frequent medical care as a person on the chronic care list at KCIW. *Id.* Petitioner Allison Moseley suffers from life-long chronic cystic fibrosis in both her lungs and digestive system. *Id.* at ¶ 20. Breathing is difficult for her even under good circumstances, but her condition has further deteriorated since KCIW stopped providing her with the four daily albuterol treatments she needs to help her breathe easier. *Id.* Petitioner Jessica Tucker is HIV-positive. *Id.* at ¶ 21. She faces the consequences daily of having a compromised immune system, often feeling tired and fatigued, and she has a difficult time recovering even from common illnesses like the cold or flu. *Id.*

Petitioner Jerahco Walls suffers from a genetic heart disease called left ventricular noncompaction, and doctors have inserted a pacemaker and defibrillator into her heart to keep it functioning. *Id.* at ¶ 22. Nevertheless, her heart usually operates between 30 and 35 percent of

2

where it should, and she often experiences chest pains in addition to feeling tired and fatigued. *Id.* Petitioner Amanda White has stage four kidney failure and is HIV-positive. *Id.* at ¶ 23. She has required hospitalization and dialysis in the past, and in May she began feeling symptoms so acutely that she could not get from her bed to the door of her cell without feeling out of breath. *Id.* Finally, doctors have diagnosed Petitioner Hollie Workman with hepatitis C, high blood pressure, COPD, and asthma. *Id.* at ¶ 24. The COPD and asthma make breathing very difficult for Ms. Workman— she can have so much difficulty breathing that she sometimes panics, and something as simple as walking between buildings at KCIW requires a long rest before she regains her breath. *Id.*

These medical conditions greatly increase Petitioners' vulnerability to COVID-19. The medical community has known for months that people who suffer from the following have an elevated risk: chronic lung disease or moderate to severe asthma; serious heart conditions; conditions that can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications; severe obesity (defined as a body mass index of 40 or higher); endocrine and metabolic disorders; diabetes; chronic kidney disease or undergoing dialysis; or liver disease. *Id.* at ¶ 31; Doc. No. 1-1, Ex. 1 to Pet., Decl. of Joe Goldenson, MD ("Goldenson Decl."), at ¶ 33.[1] Petitioners all have serious medical conditions in one or more of these high-risk categories.

---

[1] A recent update to the CDC guidelines adds more detail about the conditions that may put people at increased risk of severe illness from COVID-19. The CDC has identified the following conditions as potentially increasing risk: chronic kidney disease; COPD; immunocompromised state from solid organ transplant; obesity (BMI of 30 or higher); serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies; sickle cell disease; Type 2 diabetes mellitus; moderate-to-severe asthma; cerebrovascular disease; cystic fibrosis; hypertension or high blood pressure; immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; pregnancy; pulmonary fibrosis; smoking; thalassemia; and Type 1 diabetes mellitus. *Coronavirus Disease 2019: People of Any Age with Underlying Medical Conditions*, CDC (last updated June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-

3

This medical vulnerability makes Petitioners' experience of the COVID-19 pandemic substantially more dangerous and life-threatening. Although the fatality rate of COVID-19 is up to 30 times higher than seasonal influenza, Pet. at ¶ 35, most people who become infected with COVID-19 will potentially experience fever, cough, and shortness of breath, among other symptoms. *Id.* at ¶ 33.[2] The CDC warns, however, that older adults and people with the underlying medical conditions described above are "more likely than others to . . . require hospitalization, intensive care, or a ventilator to help them breathe, or they may even die."[3] Indeed, most people in higher-risk categories who develop serious illness will need advanced support, requiring highly specialized equipment like ventilators and an entire team of care providers. Pet. at ¶ 33. And early reports estimate that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer. Pet. at ¶ 31. While younger and more healthy people who contract COVID-19 may experience a particularly nasty flu, Petitioners' serious underlying medical conditions puts them in grave danger should they contract COVID-19.

B.  **Self-Isolation and Social Distancing is the Only Way for Petitioners to Protect Themselves from COVID-19**

As explained in the Petition, the only way for Petitioners to protect themselves from the potentially fatal consequences of contracting COVID-19 is to never encounter the virus in the first place. Respondents do not dispute that the general guidelines support this claim or that "[k]eeping

---

conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.

[2] For the full list of symptoms currently recognized by the CDC, *see Coronavirus Disease 2019 (COVID-19): Symptoms of Coronavirus*, CDC (last updated May 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

[3] *Coronavirus Disease 2019 (COVID-19): People Who are at Increased Risk for Severe Illness*, CDC (last updated June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fpeople-at-higher-risk.html.

distance from others is especially important for people who are at higher risk of getting very sick."[4] Respondents also do not disagree that Petitioners already experience fatigue, exhaustion, difficulty breathing, and difficulty recovering from illnesses, among other serious symptoms as a result of their underlying medical conditions. Nor do they dispute that these Petitioners lack the ability to tolerate risks of infection that people without medical vulnerabilities may take in stride.[5]

**C. Respondents Do Not Dispute That It is Impossible for These Petitioners to Practice Adequate Social Distancing at KCIW**

Respondents fail to disagree that it remains impossible for Petitioners to practice adequate social distancing while incarcerated at KCIW. Congregate environments, and especially prisons, are particularly dangerous environments where many people living in close proximity easily facilitates the spread of COVID-19. *See* Pet. at ¶¶ 36–42. This is true at KCIW. Petitioners report that:

- The only places in the prison where some distancing measures have been taken is at medical and the dining hall. Correctional officers removed every other chair from medical to allow people more room to spread out, and people are supposed to sit every other seat in the chow hall and leave the middle seats empty. This distancing only lasts as long as the chow hall is not full, however; as soon as the dining room begins to fill up, people can take the middle seats as well. Pet. at ¶ 50.

- People incarcerated at KCIW are in almost constant close contact with each other. Throughout the day, the people incarcerated at KCIW are almost always within an arms' reach of another person—whether using a common area, standing in line to access services or facilities, or when at work. *Id.*

- The physical layout of KCIW generally results in a constant churning of the population, with people crossing paths and coming into contact with each

---

[4] *Coronavirus Disease 2019 (COVID-19): How to Protect Yourself and Others*, CDC (last updated April 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.
[5] *See Coronavirus Disease 2019 (COVID-19): People of Any Age with Underlying Medical Conditions*, CDC (last updated June 25, 2020) (describing considerations people should make before deciding to go into public and encouraging people to "consider their level of risk"), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.

       other as they move about the facility to access the recreation yard, dining hall, or their work assignments. *Id.*

- Retreating from these crowded common spaces to individual cells provides no improved ability to practice social distancing. Many of the people incarcerated at KCIW live in open dorms containing many people in beds only about four feet apart at most. Petitioners all live in small two-person cells with the beds placed approximately two to four feet apart. It is impossible to be in the cell and keep six feet of distance away from a cellmate, and when both people are in bed, they are close enough to easily reach out and touch arms. *Id.* at ¶ 51.

- KCIW was partially locked down by dorm on June 12 as part of a "controlled containment" strategy. *Id.* at ¶ 52.

- Despite implementing a partial lock down as part of the controlled containment strategy, it does not appear that Respondents have implemented any social distancing procedures within the dorms. For example, although the program building has been put on quarantine lockdown, Petitioner White describes continuing to have contact with the 40 people in her wing. Furthermore, the "controlled containment" strategy does nothing to reduce the close proximity of incarcerated people crowded into dorms and cells where beds are four feet apart or closer. *Id.* at ¶ 54.

- A widespread outbreak of COVID-19 at KCIW is likely inescapable, regardless of Respondents' efforts from June 12 onward, due to: the 2 to 14 day incubation period of COVID-19; the near complete lack to date of preventative measures requiring the use of masks, regular cleaning and disinfecting of high-touch surfaces, frequent hand washing with readily available soap or alcohol-based hand sanitizer, and social distancing; the asymptomatic spread that has likely already been occurring for weeks; the adoption of a "controlled containment" strategy that still has not allowed for increased social distancing in crowded dorms and cells; and the delayed implementation of quarantine procedures focused on people showing symptoms of COVID-19. *Id.* at ¶ 56.

Respondents nevertheless add that that chapel activities ceased on March 11, group gym activities ended on March 13, and the law library began operating on a "modified social distancing schedule" on March 18. Doc. No. 13-2, Ex. 2 to Resp., Affidavit of Warden Vanessa Kennedy ("Kennedy Affidavit"), at ¶ 10. Yet, Respondents otherwise do not dispute Petitioners' description of their current situation at KCIW or the response of prison officials to the COVID-19 outbreak there. Petitioners live in small cells within feet of their cellmates in dorms crowded with people who

6

continue to have close contact with each other despite a partial lockdown as the COVID-19 outbreak continues. Adequate social distancing is impossible in this environment.

## II. ARGUMENT

**A. Respondents' Continued Incarceration of Petitioners Violates the Eighth Amendment**

Respondents' continued incarceration of Petitioners in a congregate environment where social distancing is impossible constitutes deliberate indifference to a substantial risk of serious harm in violation of the Eighth Amendment to the United States Constitution. Respondents do not dispute the applicable test for "deliberate indifference" and its subjective and objective prongs.[6] Respondents, however, fail to provide evidence as to why the Court should not find that Petitioners satisfy both the objective and subjective prongs.

### 1. *Petitioners Face an Objectively Serious Risk of Harm from COVID-19 that is More Severe in Both Degree and Kind as a Result of Their Medical Vulnerabilities*

First, it is clear that Petitioners objectively face a substantial risk of serious harm from COVID-19. Respondents agree that "[t]he spread of COVID-19 is indeed serious and poses a risk to everyone." Resp. at 6. Respondents are mistaken, however, when they argue that "[t]he risk faced by the Petitioners is one of degree, not kind." *Id.* at 6–7. In truth, the increased risk faced by Petitioners is one of both degree and kind. Respondents have not disputed any of the medical

---

[6] Respondents cite *Miller v. Calhoun County*, 408 F.3d 803 (6th Cir. 2005), for their propositions that "When there is ongoing action to alleviate the risk exist, the objective component requires the actions taken be grossly inadequate," and that "To be grossly inadequate the action must be so grossly incompetent or inadequate as to shock the conscience or be intolerable to fundamental fairness." Resp. at 6. It is incorrect to interpret either prong of the deliberate indifference standard as requiring the Petitioner to show behavior that "shocks the conscience." In *Miller*, the Sixth Circuit described that "[a]lthough the Supreme Court in *Farmer* set forth a mixed objective and subjective standard for deliberate indifference, this Court has held that less flagrant conduct may also constitute deliberate indifference in medical mistreatment cases." 408 F.3d at 819. The court then found that "grossly inadequate medical care . . . may amount to deliberate indifference." *Id. Miller* therefore holds that in medical mistreatment Eighth Amendment cases, an incarcerated person can demonstrate deliberate indifference *either* by using the standard objective/subjective test or by showing that the medical care provided was so grossly incompetent as to shock the conscience. The former requires a showing that the defendants knew of and disregarded a substantial risk of serious harm, while the latter would seem to require a showing that the medical care provided was so objectively horrible that it is does not matter whether the defendants knew of the substantial risk of harm. Outside of these narrow circumstances, "[t]he standard for deliberate indifference . . . is the mixed objective-subjective standard articulated by the Supreme Court in *Farmer*." *Id.* at *821.

7

allegations or expert opinion regarding COVID-19 provided to the Court by Petitioners. These sources reveal that the serious underlying medical conditions afflicting Petitioners make it more likely that they will experience serious illness should they contract COVID-19. *See* Pet. at ¶ 31; Goldenson Decl. at ¶ 33. Such serious illness, in turn, is more likely to require hospitalization, treatment in intensive care, and the use of specialized equipment like ventilators. *See* Pet. at ¶ 33.[7] Petitioners' medical vulnerabilities also make it significantly more likely that COVID-19 will kill them if they contract the virus. Pet. at ¶ 31. Thus, Petitioners are both more likely to contract COVID-19 (the question of degree) because of their inability to adequately social distance, and more likely to experience serious illness or death if they do contract the virus (the question of kind) when compared to someone without medical vulnerabilities. While the general risk and fear of illness due to COVID-19 may not be "limited to those who are incarcerated but to the population of the entire world," Resp. at 6, Petitioners face a specific, substantial, and non-speculative likelihood of death at the hands of COVID-19 that most people do not.

  2. *Respondents are Aware of the Exceptionally Grave Risk COVID-19 Presents to Petitioners*

Second, it is clear that Respondents are aware of the significantly elevated danger COVID-19 poses to Petitioners. It is undisputed that Respondents have direct knowledge of Petitioners' severe underlying medical vulnerabilities as they are the custodians responsible for providing medical care. Similarly, Respondents have been aware of the grave danger COVID-19 poses to Petitioners because of these medical vulnerabilities for months.[8] Respondents have likewise been

---

[7] *See also Coronavirus Disease 2019 (COVID-19): People Who are at Increased Risk for Severe Illness*, CDC (last updated June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fpeople-at-higher-risk.html.

[8] *See* Letter from Damon Preston, Public Advocate, Dep't of Public Advocacy and Timothy Arnold, Post Trial Division Director, Dep't of Public Advocacy, to Mary Noble, Secretary, Justice & Public Safety Cabinet, and Leila A. VanHoose, Chair, Ky. Parole Bd. (Mar. 26, 2020) ("Kentucky's prisons house large numbers of elderly people and people with complex medical conditions. If infected with COVID-19, these individuals are more vulnerable to

aware of the crucial importance of social distancing for safeguarding Petitioners. *See* Resp. at 4 (discussing CDC social distancing guidelines).[9] There is no question that Respondents are aware of the potentially fatal risks Petitioners face in the current COVID-19 outbreak.

    3. *Respondents Have Failed to Respond Reasonably to the Grave Risk COVID-19 Poses to Petitioners*

Finally, it is clear that Respondents have consciously disregarded this substantial risk of serious harm. Courts impose a reasonableness standard when evaluating whether the conscious disregard of a known risk has occurred. *See, e.g.*, *Wilson*, 2020 U.S. App. LEXIS 18087, at *20. Here, Respondents' continued incarceration of Petitioners in a congregate environment where adequate social distancing is impossible is not a reasonable response to the known grave risk faced by Petitioners. All parties agree on the steps Respondents have taken in response to COVID-19 in Kentucky prisons generally and at KCIW in particular. *Compare* Pet. at ¶¶ 43–56 *with* Resp. at 1–4. It is possible that these steps may very well pass constitutional muster in the aggregate. *See Wilson*, 2020 U.S. App. LEXIS 18087, at *22–27. *But see Wilson*, 2020 U.S. App. LEXIS 18087, at *34–48 (Cole, J., dissenting); Goldenson Decl. at ¶ 51 (providing an expert opinion that

---

becoming seriously ill and requiring intensive medical care"), *available at* https://dpa.ky.gov/News-and-Public-Information/Documents/DPA%20COVID-19%20Letter%20to%20Justice%20Cabinet%20and%20Parole%20Board%20%28FINAL%29.pdf; Coalition Letter from Amanda Hall, Smart Justice Field Organizer, ACLU of Ky. et al., to Gov. Andy Beshear (Mar. 30, 2020) ("The Centers for Disease Control and Prevention has issued guidelines indicating that adults over 60 years old and people with chronic medical conditions including lung disease, heart disease, and diabetes are at higher risk of contracting COVID-19 and are more likely to suffer serious illness and death"), https://www.aclu-ky.org/sites/default/files/wysiwyg/covid19_coalition_letter_to_beshear_with_recs_for_jails_and_prisons.pdf; Letter from Corey Shapiro, Legal Dir., ACLU of KY, to Justice Mary Noble, Secretary, KY. JUSTICE & PUBLIC SAFETY CABINET et. al (June 5, 2020) ("Older people and people with underlying medical conditions, such as asthma, lung disease, heart disease, or diabetes have a higher likelihood of developing serious illness or death. As the pandemic continues to rage across the country and around the world, medically vulnerable people incarcerated in Kentucky's prisons play a deadly waiting game."), *available at* https://www.aclu-ky.org/sites/default/files/field_documents/20200605-doc_covid-19_demand_letter-final.pdf.

[9] *See also* Letter from Corey Shapiro, Legal Dir., ACLU of KY, to Justice Mary Noble, Secretary, KY. JUSTICE & PUBLIC SAFETY CABINET et. al (June 5, 2020), *available at* https://www.aclu-ky.org/sites/default/files/field_documents/20200605-doc_covid-19_demand_letter-final.pdf; *Coronavirus Disease 2019 (COVID-19): How to Protect Yourself & Others*, CDC (last updated Apr. 24, 2020) ("Keeping distance from others is especially important for people who are at higher risk of getting very sick."), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

"conditions in Kentucky's prisons threaten the health and safety of every individual within the prisons—detained persons and staff alike—and in their surrounding communities"). Nevertheless, this case is not a forum for debating about the Kentucky Department of Corrections' response to the coronavirus pandemic in the aggregate. Rather, it examines Respondents' complete failure to respond to the exceptionally severe risks posed by the outbreak at KCIW to these seven Petitioners. And in that respect, Respondents provide no evidence or support to dispute its failure.

Practicing adequate social distancing and self-isolation is the only strategy available to Petitioners to provide them with a level of protection commensurate with the risk COVID-19 poses to them. *See* Pet. at ¶¶ 29, 57–58. Respondents do not dispute the importance of social distancing as a protective and preventative measure, agreeing that "of particular relevance to Petitioners claims in this case [is] a procedure called 'social distancing.'" Resp. at 4. Instead, Respondents first suggest that CDC guidelines give flexibility to correctional officers to decide whether to implement social distancing on an individual, group, or operational level. *Id.* While CDC guidance does describe ways to implement social distancing at each of these levels, that guidance also makes clear that "[s]trategies will need to be tailored to . . . the needs of population." Doc. No. 13-3, Ex. 3 to Resp., *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CDC (March 23, 2020) ("CDC Guidance"). Petitioners require individual social distancing as a necessary prophylactic to prevent the substantial elevated risk of serious injury or death presented by the COVID-19 outbreak at KCIW, and the flexibility cautioned by the CDC guidelines anticipates precisely such a need.

Respondents next try to avoid their obligation to provide necessary social distancing to Petitioners by arguing that the physical limitations of the facility absolve them of that duty. Resp. at 8. It is true that the CDC guidelines provides flexibility to tailor social distancing policies to

10

available space. CDC Guidance at 11. This response may be sufficient to satisfy the Eighth Amendment for setting generally applicable policies, although anything less than "6 feet between all individuals, regardless of the presence of symptoms" is still a departure from the CDC's best practices. *Id.* Again, however, this case is about the serious medical needs of these seven Petitioners—for whom it is uncontested that adequate social distancing is a necessary precaution due to their exceptional vulnerability to COVID-19. Moreover, the CDC Guidance underlines the premise of this case, when it highlights the importance of tailoring social distancing policies to the needs of incarcerated people, *id.*, and federal law requires correctional officers to address the serious medical needs of incarcerated people. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Brown v. Plata*, 563 U.S. 493, 531–32 (2011). It is an urgent necessity that Petitioners have the ability to practice adequate social distancing in the midst of a dangerous COVID-19 outbreak, and Respondents have the duty to ensure that need is met. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("[H]aving stripped [incarcerated persons] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course").

Petitioners, however, have demonstrated that practicing adequate social distancing is impossible at KCIW—even with the "controlled containment" strategies currently in place. Pet. at ¶¶ 50–56. Not only are these allegations uncontested, but Respondents have acknowledged that there is a "lack of physical distancing," and that "the limitations on social distancing are the product of the design of [the] facilities." Resp. at 8. These phrases operate as an admission of Petitioners' central point: the basic preventative measure upon which their survival of the COVID-19 outbreak may depend is fundamentally unavailable at KCIW. Taken as a whole, therefore, Respondents present the following the picture to the Court: (1) they are aware of the escalated and

grave risk COVID-19 poses to these Petitioners; (2) they are aware of the crucial importance of adequate social distancing to these Petitioners' chances of survival; (3) there is an active and uncontained COVID-19 outbreak at KCIW; (4) none of the steps Respondents have taken in response to that outbreak provide Petitioners with the ability to practice adequate social distancing, and therefore have had no impact on reducing the serious risk posed by COVID-19 to Petitioners; (5) Respondents have conceded that adequate social distancing is impossible at their facility.[10] Respondents, therefore, have recognized a known risk to Petitioners that differs in both degree and kind from the general hazards presented by COVID-19, and have taken no actions to address that risk.

In *Wilson v. Williams*, the Sixth Circuit offered three examples of unreasonable behavior constituting the disregard of a known risk of harm: (1) the disregard of a known medical risk or failure to take any steps to address that risk, *Wilson*, 2020 U.S. App. LEXIS 18087, at *28–29 (discussing *Richmond v. Huq*, 885 F.3d 928, 940 (6th Cir. 2018) ("Richmond need not show that any of the Jail staff consciously ignored her, only that her serious medical needs were consciously disregarded") (internal quotation marks omitted)); (2) the provision of medical treatment that "was essentially the equivalent of no treatment at all," *id.* at *29 (discussing *Darrah v. Krisher*, 865 F.3d 361, 368–70 (6th Cir. 2017)); (3) "turn[ing] a blind eye or deaf ear to a known problem that would indicate . . . a lack of concern for petitioners' welfare." *Id.* at *30 (discussing *Phillips v. Roane*

---

[10] Respondents try to blame "the actions of the [other] inmates" in the dining hall for the failure of social distancing. This ignores, however, the numerous allegations Petitioners make that Respondents are not enforcing even the minimal "every other seat" policy they created for use in the dining hall, and in fact abandon the policy altogether as soon as the dining hall fills up. Doc. No. 1-9, Ex. 7 to Pet., Decl. of Hollie Workman ("Workman Decl.") at ¶ 6; Doc. No. 1-8, Ex. 6 to Pet., Decl. of Nannie Blackburn ("Blackburn Decl.") at ¶ 7. Furthermore, Petitioners frequently describe a situation in which the prison is simply too small, too cramped, and too crowded for social distancing to be possible, Pet. at ¶¶ 50–54, a description of the physical structure of KCIW with which Respondents apparently agree. Regardless, the actions of other incarcerated people do not lessen Respondents' obligation to provide the necessary social distancing to Petitioners. *See, e.g.*, *Helling v. McKinney*, 509 U.S. 25, 28, 35 (1993) (incarcerated person stated a valid Eighth Amendment claim against prison officials who required him to share cell with an incarcerated person who exposed him to high levels of second-hand smoke).

*County*, 534 F.3d 531, 541 (6th Cir. 2008)). Respondents have long known that the provision of adequate social distancing was and is necessary to reduce the grave risk of serious illness or death posed by the COVID-19 outbreak to Petitioners. And yet Respondents have done nothing to ensure Petitioners' access to this essential preventative measure nor do they even attempt to claim otherwise. In so doing, Respondents have: disregarded a known medical risk and failed to take steps to address that risk; provided a response to the COVID-19 outbreak at KCIW so inadequate to address the serious and exceptional risk of harm faced by Petitioners as to be the equivalent of no response at all; and turned a blind eye and deaf ear to a known problem. Under Sixth Circuit precedent, this is unreasonable behavior constituting conscious disregard of a serious risk of harm. Such a conclusion fits appropriately within a line of Sixth Circuit precedent that ensures constitutional protection extends to medically vulnerable people in prisons.[11] To deny this same protection to Petitioners in their most desperate hour would constitute a cruel constitutional perversion, transforming the Eighth Amendment from a guarantor of dignity even in punishment to a mirage of illusive rights promised but not realized.

**B.    Uncontested Evidence Demonstrates That No Set of Conditions Would Make Petitioners' Continued Incarceration at KCIW Constitutionally Sufficient**

Habeas corpus is the appropriate remedy for Petitioners. As discussed in the preceding paragraphs, the key factual elements establishing that no set of conditions would make Petitioners' continued incarceration at KCIW constitutionally sufficient are essentially uncontested: COVID-

---

[11] *See Flanory* v. *Bonn,* 604 F.3d 249, 255 (6th Cir. 2010) (prison officials violated Eighth Amendment for failure to provide incarcerated person with toothpaste for 337 days, creating future health risk); *Talal* v. *White,* 403 F.3d 423, 427 (6th Cir. 2005) (finding constitutional concerns with exposing an incarcerated person to environmental tobacco smoke when that exposure "causes [plaintiff] sinus problems and dizziness"); *Helling v. McKinney,* 509 U.S. 25, 28, 35 (1993) (incarcerated person stated a valid Eighth Amendment claim against prison officials who required him to share cell with an incarcerated person who exposed him to high levels of second-hand smoke); *Palacio v. Hofbauer,* 106 F. App'x 1002, 1005 (6th Cir. 2004) (exposure to smoke violates Eighth Amendment when an incarcerated person has "a medical condition that is exacerbated by" second-hand smoke and the smoke "bothers" other incarcerated persons).

13

19 poses an exceptionally grave risk of harm to Petitioners, adequate social distancing is necessary to protect Petitioners from this grave risk, and this necessary social distancing is impossible at KCIW. Removal from incarceration—either permanent release or temporary movement to home confinement subject to such conditions as the Court in its wisdom finds appropriate—is the only way to remedy the constitutional violation and ensure that Petitioners can take the necessary protective step of practicing social distancing and self-isolation in a non-congregate environment. Furthermore, Petitioners all have identified to the Court safe locations to which they could be released,[12] and at least Ms. White and Ms. Hoover have both already had these home placements approved by the Parole Board.[13] Respondents have provided the Court with no objection to these addresses, nor have they provided the Court with any reason to think granting relief to these seven women would have any detrimental impact on the public. Based upon this substantial body of uncontested evidence, Petitioners contend that the papers in this case provide the Court everything it needs to grant their petition for writ of habeas corpus.

Nevertheless, Respondents argue that Petitioners have failed to meet their evidentiary burden because of supposed-flaws in Dr. Goldenson's opinion. Dr. Goldenson is clear, however: "It is my professional opinion that those who are medically vulnerable need to be moved out of Kentucky's prisons to the absolute maximum extent possible." Goldenson Decl. at ¶ 53. An expert is entitled to have a broader opinion than just the narrow subject of litigation, and the medically vulnerable people to which Dr. Goldenson refers clearly include Petitioners. *See id.* at ¶ 53 n. 32; ¶ 33. However, if the Court has any question regarding the sufficiency of Dr. Goldenson's

---

[12] Doc. No. 1-5, Ex. 3 to Pet., Decl. of Allison Moseley, at ¶ 10; Doc. No. 1-6, Ex. 4 to Pet., Decl. of Jessica Tucker, at ¶ 12; Doc. No. 1-7, Ex. 5 to Pet., Decl. of April Hoover ("Hoover Decl."), at ¶ 12; Blackburn Decl., at ¶ 11; Workman Decl., at ¶ 14; Doc. No. 1-10, Ex. 8 to Pet., Decl. of Jeracho Wells, at ¶ 12; Doc. No. 1-11, Ex. 9 to Pet., Decl. of Amanda White ("White Decl."), at ¶ 8.
[13] Hoover Decl. at ¶ 12; White Decl. at ¶ 8.

declaration or any other factual allegation presented to the Court, then the appropriate next step is to order an evidentiary hearing to resolve these outstanding questions.

### III.    CONCLUSION

For the foregoing reasons, the Court should grant Petitioner's Emergency Petition for Writ of Habeas Corpus or, in the alternative, proceed to an evidentiary hearing to resolve any outstanding questions of fact.

Dated July 2, 2020                                   Respectfully submitted,

/s/ Heather Gatnarek
Corey Shapiro
Heather Gatnarek
Aaron Tucek*
ACLU OF KENTUCKY FOUNDATION, INC.
325 W. Main St., Suite 2210
Louisville, Kentucky 40202
(502) 581-9746
corey@aclu-ky.org
heather@aclu-ky.org
aaron@aclu-ky.org

*Counsel for Petitioners*

*application for admission forthcoming*

### CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2020, the foregoing was filed electronically with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Ed Baylous
Justice and Public Safety Cabinet
Commonwealth of Kentucky
Edward.Baylous@ky.gov

/s/ Heather Gatnarek
Heather Gatnarek