**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT**

| | |
|---|---|
| NANNIE BLACKBURN, *et al.*, <br><br> *Petitioners,* <br><br> v. <br><br> MARY NOBLE, *et al.*, <br><br> *Respondents.* | Case No. 3:20-cv-046-GFVT <br><br> Judge Van Tatenhove |

**SUPPLEMENTAL BRIEF IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS**

Petitioners, seven women incarcerated at the Kentucky Correctional Institution for Women ("KCIW"), face an ongoing violation of their rights under the Eighth Amendment to the United States Constitution. Each petitioner has severe medical vulnerabilities that expose them to exceptionally grave risk from COVID-19. Respondents are aware of this grave risk posed by COVID-19 and the crucial importance of adequate social distancing to these Petitioners. Nevertheless, Respondents have failed to address Petitioners' particular vulnerabilities by continuing to incarcerate them in a congregate environment where social distancing is impossible even as a COVID-19 outbreak has erupted and spread at KCIW. At this point in the litigation, the parties have thoroughly briefed these issues, presented oral argument to the Court, and introduced evidence demonstrating Respondents' failure to reasonably respond to the potentially lethal known threat COVID-19 poses to Petitioners. On the basis of this record, Petitioners urge the Court to grant their petition for writ of habeas corpus.

1

# I. FACTS

**A. It is Impossible for Petitioners to Practice Adequate Social Distancing at KCIW**

The testimony in this case demonstrated that Petitioners do not have the ability to practice adequate social distancing while incarcerated at KCIW—the key outstanding question of fact before the Court. All four Petitioners who testified spoke of their unavoidable close contact with others throughout the prison as the COVID-19 crisis has unfolded at KCIW. These Petitioners described a situation, shared by all seven Petitioners, in which they are near other incarcerated people or correctional officers frequently throughout the day—in their rooms, waiting to use showers or toilets, at chow time, standing in the medical line, using phones or JPay machines in common areas, or even seeking relief from Kentucky's summer heat in the only air-conditioned space available to them.

In their testimony, Petitioners Jeracho Walls and Hollie Workman described the situation in KCIW's Minimum Security Unit ("MSU"), where they reside along with Petitioners Nannie Blackburn and April Hoover. *See* Doc. No. 30, Transcript of Evidentiary Hearing ("Evid. Hrg."), 8–26, 81–88 (July 21, 2020). The MSU is a building outside the main prison that houses 44 women on two floors. *Id.* at 13. Petitioners Walls, Workman, Blackburn, and Hoover (collectively, "the MSU Petitioners") are four of the 18 incarcerated people who live in two-person cells on the upper floor of the MSU. *Id.* at 84. Petitioner Walls described these cells as containing two beds, lockers, a TV stand, and a fan. *Id.* at 14. The 18 women on the upper floor share one working shower and two working toilets. *Id.* As Petitioner Walls describes, "[t]here is no social distancing in our building at all, due to the fact that there's no room." *Id.* at 13. The two beds in the cell occupied by Petitioner Walls are only about four feet apart, and even adjusting the placement of the furniture would not yield a combination that could allow her and her roommate to remain the recommended six feet apart. *Id.* at 14. Similarly, when Petitioner Walls leaves her cell to use the bathroom, she

2

often finds herself waiting in the restroom close to others for the single shower or one of the two toilets to become available. *Id.* The MSU Petitioners must leave their cells for five daily counts, two daily pill calls, and three daily meal times. *Id.* at 15. All of these occasions require lining up in close proximity to other incarcerated people: Petitioner Workman describes standing "shoulder-to-shoulder pretty much" for count, *id.* at 84, and receiving meals and medication require the MSU Petitioners to form a line on the staircase where "everybody's on one stair directly behind another person." *Id.* at 15, 85. These occasions also require standing in close proximity to the correctional officers who walk through the facility conducting the count, delivering medication, and checking to make sure that incarcerated people have taken their medication. *Id.* at 15, 18. Checking medication requires a correctional officer to stand about a foot away and look into the mouth of each incarcerated person to make sure they have swallowed their pills. *Id.* at 18.

The MSU also contains several common spaces that are almost always crowded. The MSU does not have air conditioning in the dormitory building; air conditioning is only available in the day room, a trailer behind the building containing four tables with four chairs per table. *Id.* at 13, 16. On days when it is extremely hot—it is, after all, Kentucky in July; at least 15 of the 24 days this month have reached 90 degrees or higher[1]—everyone gathers in the day room just to try to get some relief from the heat. *Id.* at 16. There is, as a result, "no room to move anywhere without being in someone's face." *Id.* Between the residential building and the day room is a backyard with picnic tables where people incarcerated in MSU can sit outside, four to a table. *Id.* at 32, 85. Finally, the basement of the MSU contains a phone room with two phones, a JPay machine, and a kiosk for people to place canteen orders. *Id.* at 16. There are no limits to how many people can enter this

---

[1] ACCUWEATHER, July 2020 Weather for PeWee Valley, KY, https://www.accuweather.com/en/us/pewee-valley/40056/july-weather/2164755.

3

room at once—sometimes as many as 15 people occupy the space—and as a result "there's no way to social distance from anybody when you're there." *Id.* at 17.

Petitioners Allison Moseley and Amanda White testified to a similar inability to practice social distancing in the other dorms at KCIW, where Petitioner Jessica Tucker is also incarcerated.[2] Petitioner Moseley described her unit of the Ridgeview Dorm as housing 42 people split between two different floors. *Id.* at 45. Each floor has three bathroom stalls, but all 42 people incarcerated in that wing must share the two working showers. *Id.* Although the prison has created a rule that only two two-person cells (four people) are allowed into the common area at any one time, in practice this rule is not observed. *Id.* at 46. For example, Petitioner Moseley described eight other people in the day room with her when making a phone call the previous day, and testified that such crowding "happens pretty much every single time that I'm out in the day room." *Id.* Petitioner Moseley also described the complete lack of social distancing during count, medical, and meal times:

- Every time that I go out for med line[,] count, meals, mail call, we're never social distanced. Any time that we're in a line for med line or meals, to get our meals or mail call, we're always lined up shoulder-to-shoulder. Somebody's right in front of you trying to fight to get their meal or their meds before somebody else, even the people that have been sick. *Id.*

- [W]e all come out and line up and get our meals just like med call. So we just line up, top and bottom floor, and it's just a single file line. Everybody lined up back-to-back pretty much. . . . You can pretty much reach out and touch somebody with your elbow bent, like, you don't even have to stretch your arm out all the way to be able to touch somebody in front of you. *Id.* at 48–49.

- [W]hen you come out for count . . . you stand side-by-side . . . I can reach in front of me and touch the two people that are in front of me, the person that is diagonal from me and the person that's beside of me. *Id.* at 49.

---

[2] Petitioner Moseley has lived in Pine Bluff, the main building, and Ridgeview since the COVID-19 outbreak began. *See* Evid. Hrg. at 41–43. Petitioner Tucker also currently lives in Ridgeview. *Id.* at 53. Petitioner White lives in the program building. *Id.* at 70.

4

Even when given an hour for recreation outside, Petitioner Moseley is in close contact with other people, as everyone in her wing is let out at once. *Id.* at 50. As a result, more than 40 people share six picnic tables, meaning there are usually 5 or 6 people sitting at every table for the whole hour. *Id.* Additionally, the location of Petitioner Moseley's cell means that "people have to pass my room to be able to go to the bathroom, to be able to go to the day room, to go to the phones, to the washer and dryer, to do anything really, they have to pass my room." *Id*. at 45. She cannot avoid contact with people throughout the day.

Petitioner White described a similar situation in the Program Building. Like the other Petitioners, Petitioner White lives with more than 40 other incarcerated people in her wing. *Id.* at 70. She has a roommate, and everyone in the wing lives in two-person cells. *Id.* at 70–71. The shared bathroom facilities put people in close contact, and the small cells mean that Petitioner White and her roommate sleep about a chair's width apart. *Id.* at 74. As with the other Petitioners, Petitioner White reports "constant" contact with other people throughout the day: at med lines, at meal times, using the phones or JPay, or at count. *Id.* at 74–75. Petitioner White estimates that no more than three and a half or four feet separate incarcerated people during count. *Id.* at 75.

In summary, Petitioners have described a constant, inescapable, and systemic lack of social distancing during the COVID-19 pandemic at KCIW. They live near roommates in small cells, come into close contact with other people when using the bathrooms or common areas, and crowd near others when waiting in lines for medication, meals, and counts. These same problems persist across the various dorms and units at KCIW, including each dorm that houses all seven Petitioners. And no new or additional policies have been put in place in recognition of Petitioners' medical vulnerability to COVID-19 that would allow them to maintain at least six feet of distance from

5

others. The weight of the evidence clearly demonstrates the impossibility for Petitioners to practice adequate social distancing while incarcerated at KCIW.

## II. ARGUMENT

### A. Respondents' Continued Incarceration of Petitioners Violates the Eighth Amendment

Respondents' continued incarceration of Petitioners in the congregate environment described above where social distancing is impossible constitutes deliberate indifference to a substantial risk of serious harm in violation of the Eighth Amendment to the United States Constitution. Under the objective and subjective prongs of the deliberate indifference test, Respondents violate the Eighth Amendment if Petitioners demonstrate: (1) an objectively substantial risk of serious harm; and (2) that Respondents subjectively knew of and disregarded this substantial risk. Courts impose a reasonableness standard when evaluating whether the conscious disregard of a known risk has occurred. *See, e.g.*, *Wilson v Williams*, 961 F.3d 829, 839–40 (6th Cir. 2020).

In this case, there is no question as to whether COVID-19 poses an objectively substantial risk of serious harm generally, *see, e.g.*, *Wilson*, 961 F.3d at 840, and to Petitioners specifically. Petitioner Blackburn is a cervical cancer survivor who has high blood pressure, an underactive thyroid, and Hepatitis C. Petitioner Hoover suffers from high blood pressure, high cholesterol, and severe heart disease. Petitioner Moseley has lived with cystic fibrosis in her lungs and digestive system for her entire life. Petitioner Tucker is HIV-positive and has a history of difficulty recovering from common illnesses like the cold or flu. Petitioner Walls has a rare heart disease for which doctors have inserted a pacemaker and defibrillator into her chest to keep her heart functioning. Petitioner White is currently in stage 4 kidney failure. Petitioner Workman receives treatment for high blood pressure, COPD, and asthma.

The CDC lists these conditions as potentially causing an increased risk of COVID-19,[3] and Petitioners' expert witness Dr. Goldenson likewise testified before the Court that these conditions either do or may[4] place people at higher risk from COVID-19. *See* Doc. No. 29, Transcript of Evidentiary Oral Argument Proceedings ("Oral Arg.") at 51 (July 14, 2020). It is likewise uncontroverted that people with severe medical vulnerabilities, such as Petitioners, face an escalated risk of serious illness requiring hospitalization or death should they become infected with COVID-19. *See* Doc. No. 1, Emergency Petition for Writ of Habeas Corpus ("Pet."), at ¶¶ 31, 33 (June 15, 2020); *see also* Oral Arg. at 52 (Dr. Goldenson testifying that the conditions on the CDC's list "are all conditions that if someone were to become infected with COVID-19, they'd be at higher risk for serious complications, including death."). Petitioners face a specific, substantial, and non-speculative likelihood of serious illness or death at the hands of COVID-19 that far exceeds the risk faced by most people, a fact which Respondents have not challenged or disputed.

Second, Respondents are clearly aware of the significantly elevated danger COVID-19 poses to Petitioners. It is undisputed that Respondents have direct knowledge of Petitioners' severe

---

[3] *See Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, CDC (last updated June 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.

[4] Counsel for Respondents has suggested that the division of the CDC's list of medical vulnerabilities into the "at increased risk" and "might be at an increased risk" categories is significant for determining whether Petitioners actually face a substantial risk of serious harm from COVID-19. *See* Evid. Hrg. at 6. This distinction by the CDC is irrelevant for the purposes of this hearing, however. The CDC has divided the list into these two categories because of the nature of scientific research into a new disease that burst onto the scene less than a year ago. The CDC only puts conditions into the "at increased risk" category when researchers have developed a sufficiently large and consistent quanta of data to confirm an association between the underlying condition and severe outcomes from COVID-19. *See Coronavirus Disease 2019 (COVID-19): Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19*, CDC (last updated July 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html. Conditions remain in the "might be at an increased risk" category when the CDC has evidence of an association with severe outcomes but lacks a sufficient quantum of data to confirm that association to a level of scientific certainty. *See id.* Petitioners need only demonstrate that COVID-19 poses an objectively substantial risk of serious harm to them, and the undisputed medical evidence generally, and the evidence presented in this case, says that Petitioners could be at increased risk of harm because of their medical conditions. Respondents had ample opportunity to offer countervailing evidence, and have not.

underlying medical vulnerabilities as they are the custodians responsible for providing medical care. *See, e.g.*, Evid. Hrg. at 10–12, 38–39, 67–70, 83. Similarly, Respondents have been aware of the grave danger COVID-19 poses to Petitioners because of these medical vulnerabilities for months.[5] Indeed, nurses employed by the Kentucky Department of Corrections have told at least Petitioner Walls that she is medically vulnerable to COVID-19. Evid. Hrg. at 22. Respondents have likewise been aware of the crucial importance of social distancing for safeguarding Petitioners. *See* Doc. No. 13, Response Opposing Petition for Writ of Habeas Corpus ("Resp."), 4 (June 29, 2020) (discussing CDC social distancing guidelines).[6] There is no question that Respondents are aware of the potentially fatal risks Petitioners face in the current COVID-19 outbreak.

With the issues discussed in the preceding paragraphs essentially uncontroverted, the key dispute in this litigation revolves around whether Respondents disregarded the known risk of serious harm posed by COVID-19 to Petitioners by failing to respond reasonably as the outbreak has continued to spread at KCIW. The clear weight of evidence in this case demonstrates that Petitioners have indeed failed to act reasonably. Practicing adequate social distancing and self-isolation is the only strategy available to Petitioners to provide them with a level of protection commensurate with the risk COVID-19 poses to them. *See* Pet. at ¶¶ 29, 57–58. Respondents do not dispute the importance of social distancing as a protective and preventative measure, agreeing that "of particular relevance to Petitioners claims in this case [is] a procedure called 'social

---

[5] *See* Doc. No. 14, Reply in Support of Petition for Writ of Habeas Corpus, note 8, at 8.
[6] *See also* Letter from Corey Shapiro, Legal Dir., ACLU of KY, to Justice Mary Noble, Secretary, KY. JUSTICE & PUBLIC SAFETY CABINET et. al (June 5, 2020), *available at* https://www.aclu-ky.org/sites/default/files/field_documents/20200605-doc_covid-19_demand_letter-final.pdf; *Coronavirus Disease 2019 (COVID-19): How to Protect Yourself & Others*, CDC (last updated Apr. 24, 2020) ("Keeping distance from others is especially important for people who are at higher risk of getting very sick."), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

distancing.'" Resp. at 4. Instead, the evidentiary dispute has focused on the adequacy of social distancing measures taken at KCIW.

The record, however, is abundantly clear that it is impossible for Petitioners to practice adequate social distancing at KCIW. The testimony provided demonstrates that the lack of social distancing is both unavoidable and systemic. Petitioners experience close contact with other incarcerated people and prison staff as they go about almost every aspect of day-to-day life, regardless of the building at KCIW in which they are housed. Three times a day Petitioners line up within a couple feet of each other to receive their meals. Twice a day they do the same to get their medications. The pill line can be particularly fraught because it also puts Petitioners in close contact with correctional officers, some of whom stand only about a foot away and look into Petitioners mouths to check whether they swallowed their pills. Five times a day Petitioners line up with everyone else in their unit for count, putting everyone within arm's reach of each other and the correctional officer conducting the count. Common areas are frequently crowded, making it difficult to conduct simple business like using the phone or JPay without being in close proximity to others. The bathroom facilities present a similar bottleneck, and Petitioners often find themselves near others when waiting to use the toilets and showers. Even in their own rooms, Petitioners cannot find relief—they all live in two-person cells which are not large enough to permit six feet of distance between themselves and their roommates.

The testimony of Warden Vanessa Kennedy provides further evidence of the dangerous lack of social distancing available to Petitioners at KCIW. Warden Kennedy confirmed that the prison has provided no additional social distancing accommodations to Petitioners, and that getting placed on the prison's "medically vulnerable" list does not provide access to any additional social distancing measures. Oral Arg. at 34–35; *see also* Evid. Hrg. at 73 (Amanda White testifying that,

9

even though she is considered to be medically vulnerable by the prison, her housing is no different than if she were not on that list). This is in direct contravention of the CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, which Respondents claim to be using to guide the KCIW response to this virus. That guidance specifically directs that the prison should "be especially mindful of cases who are at higher risk of severe illness from COVID-19…(For example, allocate more space for a higher-risk individual within a shared medical isolation space.)". Doc. No. 13-3 at 16 and 20 (parenthetical in original).

Although Warden Kennedy initially presented to the Court that KCIW was implementing social distancing measures—including providing six feet of distance—for all people in negative units, her later testimony contradicted this claim. When pressed in cross examination, she was unable to affirm that one of the steps taken by KCIW in response to COVID-19 includes making sure that individuals are able to maintain six feet of distance from each other at all times. Oral Arg. at 36. Indeed, Warden Kennedy specifically conceded that adequate social distancing may be impossible in the two-person cells where Petitioners are housed. *Id.* Moreover, Warden Kennedy also agreed that the declaration she provided in this case provided "a pretty decent list of what we have done and where we are at to this date," with the exception of some enhanced cleaning efforts not included in the declaration. *Id.* at 37. Strikingly absent from Warden Kennedy's affidavit, however, is the mention of any policies adopted by KCIW that would allow Petitioners to consistently maintain six feet of distance from others as they move through the daily incidents of prison life: using the bathroom; using the phones; lining up from meals, medication, and count; and living in a small cell with a roommate.[7] Doc. No. 13-2, Affidavit of Warden Vanessa Kennedy ("Kennedy Affidavit"), at ¶¶ 6, 9–11.

---

[7] Warden Kennedy does mention reductions in group activities and limiting access to the chapel, gym, and law library. Kennedy Affidavit, at ¶¶ 6(g), 10. These policies would not and do not, however, provide any relief from the near-

The clear weight of the evidence demonstrates that Petitioners are unable to practice the critical social distancing measures they need at KCIW, and that Respondents have failed to provide Petitioners access to this crucial precautionary measure. In so doing, Respondents have disregarded a known medical risk and failed to take steps to address that risk; provided a response to the COVID-19 outbreak at KCIW so inadequate to address the serious and exceptional risk of harm faced by the seven Petitioners here as to be the equivalent of no response at all; and turned a blind eye and deaf ear to a known problem. Petitioners' severe vulnerability to COVID-19 requires that they have access to social distancing. Respondents' refusal to take any meaningful steps toward meeting this need is consistent with examples of unreasonable actions by prison officials in the face of a known risk offered provided by the Sixth Circuit. *See Wilson*, 961 F.3d at 843–44. Respondents have acted with deliberate indifference to the substantial risk of serious harm COVID-19 poses to Petitioners in violation of the Eighth Amendment.

**B.   No Set of Conditions Would Make Petitioners' Continued Incarceration at KCIW Constitutionally Sufficient**

Habeas corpus is the appropriate remedy for Petitioners. As discussed in the preceding paragraphs, the evidence presented to the court describes a situation in which adequate social distancing is not merely impractical or difficult at KCIW, but impossible in light of the operational constraints present at that facility. The failures in social distancing are neither sporadic nor isolated in a few problem areas conducive to easy remedy. They are, instead, rooted in the very nature of prison life—KCIW is a warehouse for people, designed for efficiency through close proximity. Respondents have conceded as much. *See* Resp. at 8 (acknowledging "the lack of physical

---

constant close contact with others required by day-to-day prison life even with KCIW's "lockdown" procedures in place. Warden Kennedy has failed to identify any policies that can allow social distancing at count, meal time, pill call, using shared restrooms, or other interactions that take place in the dorms while the incarcerated population is on "lockdown."

distancing at KCIW" and describing that "the limitations on social distancing are the product of the design of facilities").[8]

As a result, activities as innocuous as visiting the bathroom can require Petitioners to wait in lines in close proximity to others; retreating to a small two-person cell provides no relief when a roommate is just a few feet away. Medicine must be delivered, food must be provided, and regular counts of the incarcerated population must be completed, but facilitating these basic tasks inevitably puts people in close contact with each other. All the evidence presented in this case supports the conclusion that at this moment in time, it is impossible for Petitioners to practice adequate social distancing at KCIW.

Consequently, release or release to home confinement is the only way for Petitioners to have access to the adequate social distancing precautions they require. Reaching such a decision would not open a flood gate of consequences upon either the Kentucky Department of Correction or the Commonwealth of Kentucky. Federal law empowers the Court to "dispose of the matter as law and justice require." 28 U.S.C. § 2243. This statutory grant of authority gives the Court broad discretion to tailor the terms of any release to those necessary to respond to the current crisis. For example, the Court need not nullify the state convictions, but could order Petitioners released to home confinement until such a time as incarceration at KCIW would once again become constitutionally permissible. Moreover, this Court has given Respondents ample opportunity to present objections to the release of Petitioners to the addresses and living situations they have provided. Given this opportunity, Respondents have failed to present any evidence or argument

---

[8] Puzzlingly, Warden Kennedy asserted in her testimony without pointing to any examples or other support that "appropriate social distancing is not physically impossible at KCIW." Oral Arg. at 47. This statement directly contradicts the language highlighted on page 8 of Respondents' Response Brief. Both statements cannot be true. Either there are limitations on social distancing due to the design of KCIW or there are not. In this case, all the evidence presented before the Court indicates that adequate social distancing is not possible at KCIW given the construct of the facility.

whatsoever suggesting that release to home confinement would result in a threat to public safety. Indeed, at least one Petitioner—Amanda White—has been granted parole and is simply awaiting release at the moment; other Petitioners' home addresses have been approved by the Parole Board for a future release date. Each of these seven Petitioners can be released without risk of harm to or impact on the public.

Importantly, this case is not a broad-based challenge to the Kentucky Department of Corrections' response to the COVID-19 pandemic. It is not a class action seeking release for large groups of incarcerated people across the Commonwealth. This case is about seven women incarcerated at KCIW with medical vulnerabilities that make them dangerously exposed to COVID-19. By continuing to incarcerate them in a congregate environment where practicing adequate social distancing is impossible, Respondents have, in violation of the Eighth Amendment, prevented Petitioners from taking a critical precautionary measure that could save their lives. Because no condition or set of conditions could make adequate social distancing possible at KCIW, their continued confinement at KCIW in the midst of a dangerous coronavirus outbreak is constitutionally impermissible. As such, habeas corpus relief would provide Petitioners with the only appropriate remedy for their constitutional injuries.

### III. CONCLUSION

Jerahco Walls testified as to the stakes Petitioners have in this case: "I feel like since the COVID outbreak that I am an inmate that's sitting on death row. . . . [E]very day is just a question of, am I going to contract the COVID today, and am I going to be alive tomorrow? My biggest fear is not being able to go home to my children and not being able to be there for them." Evid. Hrg. at 25. The Eighth Amendment exists to protect Petitioners from this grim fate. For the reasons described herein, the Court should grant Petitioners' Emergency Petition for Writ of Habeas Corpus.

Dated July 24, 2020                                    Respectfully submitted,

                                                    /s/ Heather Gatnarek
                                                    Corey Shapiro
                                                    Heather Gatnarek
                                                    Aaron Tucek*
                                                    ACLU OF KENTUCKY FOUNDATION, INC.
                                                    325 W. Main St., Suite 2210
                                                    Louisville, Kentucky 40202
                                                    (502) 581-9746
                                                    corey@aclu-ky.org
                                                    heather@aclu-ky.org
                                                    aaron@aclu-ky.org

                                                    *Counsel for Petitioners*

                                                    *\*application for admission submitted*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2020, the foregoing was filed electronically with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

    Ed Baylous
    Justice and Public Safety Cabinet
    Commonwealth of Kentucky
    Edward.Baylous@ky.gov

                                                    /s/ Heather Gatnarek
                                                    Heather Gatnarek